**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------X
STEVEN LEE,                                         Civil Case No:

                    Plaintiff,

    -against-

                                                    **COMPLAINT**

HENRY G. JARECKI,
CHRISTOPHER HARRISON,
THE FALCONWOOD CORPORATION,
DOES 1 through 50, inclusive,                       Plaintiff Demands a
ABC Corporations 1 through 50, inclusive,           Trial by Jury



                    Defendants.
---------------------------------------------------------X

Plaintiff STEVEN LEE ("LEE" or "PLAINTIFF"), by his attorneys, DEREK SMITH LAW

GROUP, PLLC, hereby complains of Defendants HENRY G. JARECKI ("JARECKI"),

CHRISTOPHER HARRISON ("HARRISON"), THE FALCONWOOD CORPORATION,

DOES 1 through 50 inclusive, ABC Corporations 1 through 50, inclusive, and other corporate

entities and trusts, upon information and belief as follows:

### NATURE OF CASE

1. Plaintiff LEE is a brilliant investor with a decorated career in finance. Defendant

    JARECKI is a world-renowned investor, billionaire, and owner of many investment

    groups.  In 2013, JARECKI agreed to implement many of LEE's investing and trading

    strategies. In exchange, LEE was promised adequate compensation. To date, JARECKI

    continues to use and make profit from LEE's strategies. To date, JARECKI has not

    adequately paid LEE.

2.   Plaintiff LEE complains pursuant to the statutory and common laws of the State of New York and seeks damages to redress the injuries Plaintiff suffered as a result of, *inter alia*, breach of contract, unjust enrichment, quantum meruit, fraud, and defamation.

## JURISDICTION & VENUE

3.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.§1332, in that this action is between citizens of different states and the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

4.   This Court has personal jurisdiction over Defendant JARECKI and Defendant HARRISION in that they are citizens and residents of the State of New York and/or conduct substantial business within the state.

5.   This Court has personal jurisdiction over the remaining corporate Defendant in that their principal place of business is within the State of New York, New York County.

6.   This Court is a proper venue for this action, pursuant to 28 U.S.C. § 1391 (b) (1) and (2) in that Defendants reside in this district and a substantial part of the events or omissions giving rise to the claim occurred within this district.

## PARTIES

7.   At all times material, Plaintiff is a citizen of the State of Florida.

8.   At all times material, Defendant JARECKI, was and is a citizen of the State of New York and resides in New York County.

9.   At all times material, Defendant HARRISION was and is believed to be a citizen of the State of New York and resides in Rockland County.

10.   At all times material, Defendant HARRISION conducts business in the State of New York, New York County.

11. At all times material, Defendant THE FALCONWOOD CORPORATION ("FALCONWOOD") was and is a foreign business corporation, duly existing by the virtue and laws of the State of Delaware, authorized to conduct business, and conducting business, in the State of New York, New York County.

12. At all times material, GRESHAM INVESTMENT MANAGEMENT LLC, Defendant FALCONWOOD, and COMMODITY INVESTMENT FUND LLC (hereinafter referred to collectively as "Jarecki Entities") were and are owned and operated in whole or in part by Defendant JARECKI.

13. At all times material, Defendant HARRISION was and is an agent for Jarecki Entities.

14. Plaintiff is unaware of the true names and capacities of the defendants sued herein as DOES 1 through 20, inclusive, and therefore sues these defendants by fictitious names. Plaintiff will seek leave of the Court to amend this complaint to allege their true names and capacities when ascertained.

15. Plaintiff is unaware of the true names and capacities of the defendants sued herein as ABC Corporations 1 through 50, inclusive, and therefore sues these defendants by fictitious names. Plaintiff will seek leave of the Court to amend this complaint to allege their true names and capacities when ascertained.


## STATEMENT OF FACTS

16. In or around March of 2013, Plaintiff devised an arbitrage trade. This trade involved purchasing units or shares of certain publically-traded commodities trusts (e.g. gold, silver, platinum and palladium) and exchanging them for the underlying commodity, purchasing commodities trusts at a discount and selling them at a premium, or

capitalizing on temporary fluctuations around the commodities trusts net asset value, thereby exploiting minor differences in price between the commodities trust and the actual commodity. ("Original Trade Idea").

17. Plaintiff shopped around his Original Trade Idea to advanced investors, including Warren Buffet.

18. In or around June of 2013, Plaintiff contacted Defendant JARECKI seeking funding to set up a hedge fund and implement the Original Trade Idea.

19. Thereafter, Defendant JARECKI agreed to meet Plaintiff.

20. On or about August 7, 2013, Plaintiff met Defendant JARECKI and Defendant GRESHAM's President JONATHAN SPENCER ("SPENCER") at Defendant FALCONWOOD's office located at 257 Park Avenue, New York, New York 10010.

21. Before sharing in great detail how the Original Trade Idea would be implemented, Plaintiff shared with Defendants JARECKI and SPENCER his concern that the Original Trade Idea could be replicated by Defendants or any of Defendants' entities, which would not be fair to Plaintiff. To assuage Plaintiff's concerns, JARECKI told Plaintiff "**Steve, I will not do this trade without you**." With JARECKI's promise, Plaintiff shared with Defendants the Original Trade Idea in its entirety.

22. Thereafter, Defendant JARECKI told Plaintiff he would get back to Plaintiff within a day to resolve what he called a "minor accounting issue."

23. On or about August 13, 2013, Plaintiff and Defendant HARRISON met and discussed both Defendant JARECKI's underlying concerns and solutions to accounting problems.

24. On or about August 16, 2013, Defendant JARECKI wrote to Plaintiff and assured Plaintiff that he would engage in the Original Trade Idea if all of his "anxieties" were resolved and promised to find a "good road."

25. On or about August 19, 2013, Plaintiff met with Defendants JARECKI and HARRISON at JARECKI's office. JARECKI and HARRISON then walked with Plaintiff to JARECKI's home. At JARECKI's home, Plaintiff presented a plan of investing One Hundred Million ($100,000,000) in a specific commodity trust to ultimately yield a profit. Plaintiff fielded all questions and concerns from Defendants JARECKI and HARRISON.

26. After Plaintiff's presentation, Defendant JARECKI showed Plaintiff a room in his home. The room was being converted into a trading office for Plaintiff.

27. Thereafter, on or about August 23, 2013, Plaintiff met again with Defendants JARECKI and HARRISON. JARECKI informed Plaintiff that he had decided he wanted to fully execute the Original Trade Idea and Plaintiff should be able to begin trading on the idea as of August 26, 2013.

28. During the same meeting, Defendant JARECKI proposed to Plaintiff that Plaintiff continue to provide to him and his entities, "close-to-zero-risk" specific trade ideas, business ideas, and investment ideas ("Trade Idea").

29. Upon agreeing to fully implement Plaintiff's Original Trade Idea and agreeing to provide Defendant JARECKI more original Trade Ideas, the two parties agreed to the following ("Oral Agreement"):

    a.  The Original Trade Idea was covered by the agreement;

b.  Plaintiff was entitled to twelve percent (12%) of the gross profits, subject to minimum monthly compensation of $12,500, on any transaction under the Original Trade Idea engaged in by JARECKI or any Jarecki Entities, or JARECKI's agents at any time.

c.  In addition to the Original Trade Idea, Plaintiff would provide Defendants other original Trade Ideas;

d.  JARECKI would have Plaintiff and JARECKI's subordinates investigate any new Trade Ideas and, if JARECKI decided to execute one, JARECKI would put up the funds to execute said ideas;

e.  If JARECKI decided to execute any Trade Idea then Plaintiff would receive twelve percent (12%) of the gross profits on any transaction engaged in by JARECKI or any of the Jarecki Entities at any time afterwards;

f.  As long as the agreement was in force, Plaintiff would receive Twelve Thousand Five Hundred Dollars ($12,500) per month as a draw against the expected profits;

g.  JARECKI would pay for Plaintiff's Bloomberg subscription;

h.  JARECKI would attempt to obtain health insurance coverage for Plaintiff;

i.  In addition to conceptualizing new Trade Ideas, Plaintiff would;

    i.  Analyze securities and commodities and would pick out the most advantageous periods to transact in them in accordance with the Trade Ideas and would subsequently monitor such transactions;

    ii.  Work with Jarecki's employees, subordinates, and attorneys from any and all of Jarecki's Entities to investigate and implement any Trade Ideas.

30.  Thereafter, Defendant HARRISON sent Plaintiff a congratulatory e-mail.

31. From August through November of 2013, in addition to the Original Trade Idea, Plaintiff

    disclosed other Trade Ideas, including, but not limited to:

    a. Arbitraging price discrepancies between the price of various commodities and equities in different markets;

    b. Increasing the yield of JARECKI's, Jarecki Entities', as well as any other entities cash position;

    c. Capitalizing on closed end funds tender offers, reorganizations, open endings, mergers and rights offerings;

    d. Arbitraging state lotteries;

    e. Capitalizing on corporate activism related to closed end funds;

    f. Trading closed end funds versus the underlying assets;

    g. Trading different classes of the same equity security;

    h. Capturing inefficiencies related to the dividend payments on equity securities;

    i. United Kingdom versus United States ADR stock spread trade idea;

    j. Buying employee stock options at a discount;

    k. Index arbitrage before and after hours;

    l. Pair trade merger arbitrage stocks after the deal has closed during a trading day;

    m. Capitalize on the failure of people to exercise their call options on closed end fund options such as ASA;

    n. Trade single asset closed end funds versus the underlying asset;

    o. Capture split off bonuses;

    p. Instant lottery scratch off ticket arbitrage;

    q. Capture profits by participating in Dutch tender offer;

r.   Buying GDL stock and hedging it in order to earn a very high yield on an almost
     risk free basis;

s.   Capitalizing on closed end funds that trade at a premium by making an offer to
     the sponsoring company to buy the shares directly from them at parity and then
     immediately reselling the shares at a premium on the stock market;

t.   Trading Berkshire Hathaway class A shares against Berkshire Hathaway class B
     shares;

u.   Investing in GTU closed end fund at a discount and trying to convince Sprott
     Management to acquire the fund or try to force the fund to conduct a tender offer
     at parity or try to persuade the company to liquidate all of the assets and distribute
     the proceeds to shareholders;

v.   Invest in Canadian companies that allow you to reinvest your dividends at a
     discount to market prices. Borrow huge amounts of these securities and create a
     near risk free profit;

w.   Invest in equities and bonds before the 1st and 15th of every month and then sell
     them the next day because people typically invest in their 401k through automatic
     payroll deduction and therefore they push prices up so buy equities and bonds the
     day before each pay period and sell the day of each pay period;

x.   Buy closed end funds at a discount and then persuade management to liquidate
     the fund or conduct tender offers at a discount smaller than that fund's discount in
     the marketplace;

y.   Form a business to create closed end funds that will automatically convert into
     exchange traded funds if certain conditions occur in order to offer investors the

ability to lower their capital gains tax liability due to the fact that profits on closed

end fund capital gains are taxed at lower rates than profits are taxed at for

exchange traded funds. Charge a substantial management fee for this product;

z.   Create leveraged exchange traded products that merely shift cash in between the

long and short funds in order to almost eliminate transaction and financing

costs. Charge a substantial management fee for this product;

aa.   Invest in net leased real estate and hedge the risk away by buying credit default

swaps on the company that leases the real estate;

bb.   Trade ordinary versus ADR shares around the ex-date if this date differs between

countries because the market may fail to price in the fact that the stock in one

country should trade at a different price than that in the other country;

cc.   Buy equities at a discount to market value from the IRS auctions of seized

property;

dd.   Automatically selling equity options at a fraction above intrinsic value whenever

a cash takeover closes during the trading day;

ee.   Buy all closed end funds before the ex-date because their prices may be depressed

due to the fact that people may sell to avoid tax consequences of receiving the

dividend;

ff.   Buy closed end funds when they approach a 10% discount or whatever level of

discount the fund management says they may repurchase shares at;

gg.   Capitalize on the fact that investors in developing countries such as China and

India may not exercise their call options before dividends;

hh.  Buy securities before their dividend pay date and sell them on their dividend pay
date since many investors automatically reinvest their dividends and this can
causes prices to go up;

ii.  Buy the currencies of high yielding countries on a Friday afternoon and sell on a
Monday morning in order to capture the interest rate differential over 3 days but
only have about 1.5 days of risk;

jj.  Profit from arbitraging the fact that equity derivatives often trade at different
implied volatilities between different countries;

kk.  Capitalize on the fact that stocks of companies in which the founder dies can fall
due to selling pressure caused by heirs having to sell stock to pay estate taxes;

ll.  Capitalize on the fact that Berkshire Hathaway stock may fall after Buffett dies
due to the fact that a charity will receive his stock and may sell it to diversify their
holdings.

32.  In or around August through November of 2013, Plaintiff continued to oversee the
implementation of the Original Trade Idea as well as other Trade Ideas. Plaintiff
monitored the prices of the trust units and the underlying commodities and continued to
work with Jarecki's subordinates. Plaintiff also contacted various brokerage houses to
open trading accounts on the most advantageous terms for Defendant Jarecki and the
Jarecki Entities' behalf.

33.  During the same time, Plaintiff worked closely with Jarecki's subordinates, including
Defendant HARRISON, on implementing new Trade Ideas. Plaintiff would field
questions from HARRISON based on Plaintiff's Trade Ideas, work out concerns related
to the Trade Ideas, and discuss ways to minimize risks on new Trade Ideas. The two men

exchanged information on international tax issues, storage costs of commodities overseas,
potential customs duties, and other details that would allow the Original Trade Idea, as
well as other Trade Ideas, to be implemented.

34. At all times material, Defendant JARECKI told Plaintiff he was considering providing
Plaintiff "seed money" for Plaintiff to start his own hedge fund. While Plaintiff worked,
JARECKI repeatedly told Plaintiff he had many investors looking to fund a start-up
hedge fund. Plaintiff was delighted with the prospect.

35. In furtherance of the Oral Agreement, Plaintiff helped Jarecki's subordinates and Jarecki
Entities' employees on various issues, such as, but not limited to:

    a.  Negotiating storage prices and terms for Canadian accounts;

    b.  Negotiating shipping rates for metals between Canada and Switzerland,
Switzerland and New York, and Canada and New York;

    c.  Reviewing contract language for Canadian accounts, and negotiating the terms of
brokerage agreements with Interactive Brokers, Bank of America, and Charles
Schwab, and negotiating financing rates and optimizing borrowing ability;

    d.  Negotiating rates for Jarecki Entities' accounts at Charles Schwab, Goldman
Sachs and Barclays;

    e.  Developing and implementing automated trading strategies;

    f.  Creating computer models, researching and analyzing data from Bloomberg to
determine profitable times to trade;

    g.  Developing spreadsheets and other methods for calculating the value of the metals
in the trusts;

    h.  Exploring trading gold, silver, and platinum at the daily fix price; and

       i.    Arranging meetings and calls with bank representatives to process trades, as well as providing leverage and deploying infrastructure to facilitate trades and researching new trade ideas.

36. Plaintiff estimates that between August through December of 2013, he spent about sixty (60) hours per week attempting to uphold his end of the Oral Agreement.

37. At all times material, Plaintiff made it plainly clear to Defendant JARECKI that Plaintiff was not working for free, and expected to be compensated for coming up with all ideas based on the Oral Agreement.

38. On or about October 3, 2013, Defendant JARECKI demanded Plaintiff meet with him. Plaintiff complied. At the meeting, JARECKI informed Plaintiff that there was some unspecified problems in putting Plaintiff on any of the Jarecki Entities' payrolls. Thereafter, Defendant GRESHAM's Chief Financial Officer STANLEY LEFKOWITZ ("LEFKOWTIZ") gave Plaintiff a check for $10,000 as a draw against the expected profits from the Original Trade Idea—not the $12,500, as previously agreed upon.

39. As a result of not being put on any of the Jarecki Entities' payrolls, Plaintiff's health insurance would not be paid for.

40. The $10,000 was the first and only money Plaintiff would ever receive from Defendant JARECKI or any Jarecki Entities.

41. During the same meeting, Defendant JARCEKI stated to Plaintiff that the Oral Agreement was too advantageous to Plaintiff. JARECKI then notified Plaintiff that he was going to unilaterally change Plaintiff's compensation structure under the Oral Agreement as follows: each month, Plaintiff would be entitled to the greater of $12,500 or ten percent (10%) of profits from trades executed under the Original Trade Idea or any

other Trade Idea. Having no choice, Plaintiff agreed to the new compensation terms. All

other aspects of the original Oral Agreement remained unchanged. ("Modified Oral

Agreement").

42. Although Plaintiff brought the Original Trade Idea to Defendant JARECKI and invested

time and energy in implementing the trades, Plaintiff was not informed when JARECKI

or Jarecki Entities began to engage in trades under the Original Trade Idea. At some

point, in or around September of 2013, Plaintiff learned the JARECKI and Jarecki

Entities had begun to execute the Original Trade Idea. By November of 2013, Plaintiff

further learned that JARECKI had redeemed over $1,000,000 worth of trust shares for

physical gold as called for by the Original Trade Idea.

43. At various times, Plaintiff would ask JARECKI and Jarecki's subordinates for details on

these trades. Defendants rarely provided Plaintiff details for all of the relevant

transactions.

44. In or around November of 2013, Plaintiff noticed trades in commodities trusts—that were

the subject of the Original Trade Idea—had increased substantially. Plaintiff further

noticed that redemptions of trust units into the underlying commodities also skyrocketed.

45. On or about November 27, 2013, Plaintiff met with Defendants JARECKI and

HARRISION in JARECKI's office. Plaintiff expected to discuss the gross profits from

the Original Trade Idea and other Trade Ideas. To Plaintiff's shock, JARECKI told

Plaintiff he found Plaintiff's Original Trade Idea unattractive. However, during this

meeting, JARECKI and HARRISION told Plaintiff that JARECKI had purchased Five

Million Dollars ($5,000,000) worth of shares in commodities trusts pursuant to the

Original Trade Idea. Up until this point, Plaintiff had only known that JARECKI had

redeemed $1,000,000 on such trades, and was shocked to learn JARECKI had increased

his investment by $4,000,000 in only a few weeks. Plaintiff was further confused by

JARECKI—on the one hand, deeming Plaintiff's Original Trade Idea unattractive, yet on

the other hand, investing large sums on money based on it.

46. By the end of November 2013, neither Defendant JARECKI, nor any of JARECKI's
subordinates or employees, provided adequate information to Plaintiff about the Original
Trade Idea or other Trade Ideas.

47. Additionally, Defendants stopped paying for Plaintiff's Bloomberg subscription.

48. In or around December of 2013 through January of 2014, Plaintiff continued to monitor
activity of the commodities trusts and noticed substantial increased trading in the
commodities trusts and a similar rise in redemptions.

49. In or around January of 2014, Plaintiff requested that Defendant JARECKI pay him his
current share of the gross profits on the Original Trade Ideas.

50. On or about January 24, 2014, Plaintiff met with Defendants JARECKI and HARRISION
at JARECKI's FALCONWOOD office.

51. At the meeting, Plaintiff informed both Defendants JARECKI and HARRISION of the
unusually high trading and redemption activity in the commodities trusts subject to the
Original Trade Idea. Plaintiff asked JARECKI if he was doing the trading. Both men
denied any knowledge of such transaction, and sarcastically asked if it was Plaintiff who
was trading $100,000,000 in the commodities trusts subject to the Original Trade Idea
behind *their* backs.

52. Defendant JARECKI then attempted to pay Plaintiff for his 10% share of the gross profits
on the Original Trade Idea. JARECKI stated to Plaintiff that, based on the transactions in

which JARECKI had engaged in pursuant to the Original Trade Idea, Plaintiff was due a check for $20,000. JARECKI stated "Basically, I'm going to give you a check for $20,000, which I think is more than correct, the total we made to date is $25,185." Based on the trading activity, Plaintiff believed he was owed significantly more. Plaintiff was further discouraged as he did not have adequate access to Jarecki Entities to see the true gross profits off his Original Trade Idea or other Trade Ideas.

53. At the same meeting, Defendants JARECKI and HARRISION demanded Plaintiff sign two documents not previously discussed or agreed upon: (i) a Confidentiality Agreement and (ii) a Non-Competition Agreement. Both JARECKI and HARRISION demanded Plaintiff sign both documents on the spot before they gave Plaintiff the $20,000 check. The Non-Competition Agreement sought the use of and intellectual property rights to Plaintiff's Original Trade Ideas and Trade Ideas in perpetuity. The Confidentiality Agreement sought a waiver of claims against Defendant JARECKI and Jarecki Entities.

54. Plaintiff asked JARECKI about total gross profits from the Original Trade Idea. Defendant JARECKI stated he had made "about $45,000" on trades under the Original Trade Idea. JARECKI then stated that Plaintiff was entitled to $37,500 of that $45,000 (or 3 months at $12,500) under the Modified Oral Agreement, minus $10,000 already paid.

55. Believing he was owed substantially more money, Plaintiff refused to accept the $20,000 and refused to sign the Confidentiality and Non-Competition Agreements.

56. Subsequently, Plaintiff conducted further research into Defendant JARECKI's and Jarecki Entities' trading activities and concluded that the volume of trading JARECKI and the Jarcki Entities had engaged in pursuant to the Original Trade Idea was much

higher than JARECKI had represented to him. Upon information and belief, JARECKI

had traded assets equal to almost four hundred times more than what JARECKI and

HARRISON told Plaintiff – involving the purchase of 759 bars of gold each weighing

approximately 400 ounces and worth about $400,000,000. Such a trade alone would

entitle Plaintiff to an exponentially higher share of profit under the Modified Oral

Agreement.

57. Plaintiff has repeatedly demanded payment from Defendant JARECKI and Jarecki

Entities pursuant to the Modified Oral Agreement.

58. Thereafter, Defendant JARECKI and all Jarecki Entities refused to properly pay Plaintiff.

59. On or about August 27, 2014, Plaintiff attempted to bring an action to redress the injuries

he sustained as a result of Defendant JARECKI and Jarecki Entities' actions ("Previously

Filed Complaint," Docket No. 1:14-cv-06986-KBF).

60. On or about August 29, 2014, Defendant JARECKI gave an interview to REUTERS in

which JARECKI made false and defamatory statements about Plaintiff and Plaintiff's

business practices. JARECKI stated, among other things:

- *"Jarecki says, he did not make nearly as much money from* [the Original Trade
  Idea] *as Lee contends."*
- *"Lee's arbitrage strategy yielded a small profit of about $1,000 to $2,000 for every
  $1 million invested, Jarecki said."*
- *"The $400 million figure cited in the lawsuit was "just beyond my imagination,"
  Jarecki told Reuters in an interview on Thursday."*
- *"Jarecki said he had tried to pay Lee between $20,000 and $30,000—enough to
  compensate him for the trading idea and a share of profits from trades. The
  problem, he said, is that Lee stopped coming to the office and responding to phone
  calls. "It was as if he had disappeared,"* [JARECKI] *said."*

61. At all times material, Defendant JARECKI's statements were published online and

distributed internationally.

62. At all times material, Defendant JARECKI's statements were inaccurate and disparaged Plaintiff's business practices, investment ideas, and arbitrate strategy.

63. As a direct result of Defendant JARECKI's statements, Plaintiff was unable to secure future employment.

64. As a result, Plaintiff went from having lunch with Warren Buffet to purchasing lunch with food-stamps.

65. As a direct result of Defendant JARECKI's statements, Plaintiff suffered and continues to suffer significant economic and non-economic harm.

66. As a result of "working" with Defendant JARECKI and Jarecki Entities, Plaintiff was left with a $300 loss.

67. Plaintiff suffered serious health issues and was unable to fully participate, recollect facts, and speedily litigate the matter in the Previously Filed Complaint.

68. As a result of serious health issues, Plaintiff was unable to bring the defamation claim in a timely manner.

69. As a result, Plaintiff's Previously Filed Complaint was dismissed without prejudice.

70. As of recent, Defendants continue to use Plaintiff's Original Trade Idea and other Trade Ideas.

71. As of recent, the profitability of Plaintiff's Original Trade Idea is 2,000% higher than Defendant JARECKI falsely stated in his RUETERS interview.

### AS A FIRST CAUSE OF ACTION
### BREACH OF CONTRACT
### (AS AGAINST DEFENDANT JARECKI)

72. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

73. Under New York law "[t]he elements of a cause of action for breach of contract are (1) formation of a contract between plaintiff and defendant, (2) performance by plaintiff, (3) defendant's failure to perform, (4) resulting damage" *U.S. Nonwovens Corp. v. Pack Line Corp.*, 4 N.Y.S.3d 868, 871–72, 48 Misc.3d 211, 215 (N.Y.Sup.,2015).

74. A contract existed between Plaintiff and Defendant JARECKI.

75. Plaintiff adhered to his contractual duties providing Defendant JARECKI his Original Trade Ideas and other Trade Ideas.

76. Defendant JARECKI breached the contract by, among other things, not paying Plaintiff pursuant to the agreed upon terms, not adhering to the contractual obligations in good-faith, unilaterally changing the terms and conditions of the contract.

77. As a result, Plaintiff suffered significant damages, the exact amount to be proven at trial, together with an award of interest, costs, disbursement, and attorneys' fees.

## AS A SECOND CAUSE OF ACTION
## UNJUST ENRICHMENT
## (AS AGAINST ALL DEFENDANTS)

78. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

79. Plaintiff provided a benefit to Defendants in the form of the Original Trade Idea as well as other Trade Ideas.

80. Defendants knew of and accepted the benefit provided by Plaintiff, and knew that such benefit was of a type for which compensation was and is reasonably expected.

81. Defendants were enriched by the benefit Plaintiff provided, in the form of profits from transactions Defendants engaged in, based upon Plaintiff's Original Trade Idea as well as Plaintiff 's other Trade Ideas.

82. Defendants' enrichment came at Plaintiff's expense, as Plaintiff provided the trade ideas and other labor without which Defendants could not have executed the transactions, and for which Plaintiff was not properly compensated.

83. As the facts herein describe, Defendants' enrichment is unjust, and against equity and good conscience, and as such restitution should be made to Plaintiff.

**AS A THIRD CAUSE OF ACTION**
**QUANTUM MERUIT**
**(AS AGAINST ALL DEFENDANTS)**

84. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

85. Plaintiff performed labor for Defendants on and relating to the Original Trade Idea, as well as other Trade Ideas, in good faith.

86. Defendant voluntarily accepted the work Plaintiff performed.

87. Plaintiff had a reasonable expectation of receiving appropriate payment for the work he performed for Defendants, but Defendants failed to remunerate Plaintiff accordingly.

88. Plaintiff was entitled to payment at a rate which constitutes the reasonable value of his services, together with an award of interest, costs, disbursements, and attorneys' fees.

**AS A FOURTH CAUSE OF ACTION**
**FRAUD**
**(AS AGAINST ALL DEFENDANTS)**

89. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

90. Defendants made several false claims and representations to Plaintiff, including without limitation the following:

91. Defendants told Plaintiff that Defendants would not make any trades under the Original
Trade Idea without including Plaintiff ("Steven, I will not do this trade without you.")
However, Defendants made and continue to make such trades without telling Plaintiff or
allowing Plaintiff to access information on said trades;

92. Defendants told Plaintiff that he would be paid on a monthly draw and potentially more
based on a percentage of the profits from all trades Defendants made under the Original
Trade Idea and other Trade Ideas. However, Defendants failed to make any payment to
Plaintiff other than the one-time $10,000 payment.

93. Defendants concealed trades they were making under the Original Trade Idea and other
Trade Ideas.

94. When confronted, Defendants grossly misrepresented the volume and profit of relevant
trades.

95. Defendants knew the falsity of these representations.

96. Defendants made these representations to Plaintiff with the intent of misleading Plaintiff
and causing Plaintiff to rely on and act upon Defendants' representations, specifically by
divulging the Original Trade Idea and other Trade Ideas and doing other valuable work
for Defendants, and to induce him to accept lower compensation for Defendants' trades
based on Defendants' falsified information.

97. Plaintiff was not aware of the falsity of Defendants' representations at the time they were
made, Plaintiff had a right to rely on and trust Defendants' representations, and did in fact
rely upon and trust of Defendants' representation.

98. Plaintiff was injured due to his reliance on Defendants' false representation and is
entitled to damages and other relief in an amount to be proved at trial.

**AS A FIFTH CAUSE OF ACTION**
**DEFAMATION PER SE**
**(AS AGAINST DEFENDANT JARECKI)**

99. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

100. "The elements of a cause of action for defamation are a false statement, published without privilege or authorization to a third party, constituting fault as judged by, at a minimum, a negligence standard, and it must either cause special harm or constitute defamation per se." *Konig v. CSC Holdings, LLC*, 112 A.D.3d 934, 935, 977 N.Y.S.2d 756, 758 (2013).

101. A statement constitutes defamation *per se* if it "tends to injure another in his or her trade, business of profession." *Id.*

102. Defendant JARECKI falsely stated, among other things, in sum and substance that Plaintiff's strategies did not work very well, that Plaintiff's strategies did not yield more than a minimal profit, that relatively little capital was committed to Plaintiff's strategies ("*Lee's arbitrage strategy yielded a small profit.*"), and that Plaintiff essentially disappeared.

103. The above mentioned statements were published without privilege or authority to a third party.

104. Defendant JARECKI's false statements directly injured Plaintiff's professional reputation.

105. The above mentioned statements significantly harmed and continue to harm Plaintiff's ability to gain funding for hedge funds, gain employment, and significantly impacted his reputation.

106. As a result of Defendants' defamatory and false statements, Plaintiff has suffered significant pecuniary damages, including a significant loss of income, on-going reputational damage, and other non-pecuniary losses including severe emotional distress..

107. Due to Plaintiff's mental incapacity, the statute of limitations on the above mentioned claimed is equitably tolled.

**WHEREFORE**, Plaintiff respectfully requests a judgment against the Defendants for all available damages including but not limited to emotional distress, lost wages, back pay, front pay, future lost wages, reputational damages, punitive damages, statutory damages, attorneys' fees, costs, medical expenses, interest and all other damages as are just and proper to remedy Defendants' unlawful employment practices.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: New York, New York
        October 15, 2018

> **Respectfully Submitted,**
>
> **DEREK SMITH LAW GROUP, PLLC**
>
> **/s/ Alexander G. Cabeceiras**
> Alexander G. Cabeceiras, Esq.
> One Penn Plaza, Suite 4905
> New York, New York 10119